# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## PEOPLE v ALEXANDER

Docket No. 168009. Argued on application for leave to appeal April 9, 2026. Decided July 15, 2026.

Defendant, Gwendolyn Josephine Alexander, was convicted following a jury trial in the Wayne Circuit Court, Mariam Saad Bazzi, J., presiding, of one count of torture, MCL 750.85, one count of second-degree child abuse, MCL 750.136b(3), one count of second-degree child abuse in the presence of another child, MCL 750.136d(1)(b), and one count of third-degree child abuse, MCL 750.136b(5). Defendant's six-year-old son, MA, was transported to an emergency room after a police officer conducting a welfare check observed bruising, swelling, and scarring on his body. The treating physician observed swelling around MA's ankles and hyperpigmented scars on his ankles and wrists, and she rendered a diagnosis of nonaccidental lesions and possible child abuse. Defendant admitted to police that she and her partner and codefendant, Errown Scott, had tied MA up with a belt around his wrists for hours at a time. At trial, MA testified that Scott had on several occasions, in defendant's presence, restrained him using zip ties. Dr. Dena Nazer, an expert in child abuse pediatrics and general pediatrics, testified that she had diagnosed MA with "medical torture," which she explained was a clinical diagnosis reserved for children exposed to at least two physical assaults accompanied by at least two forms of psychological maltreatment. On cross-examination, Dr. Nazer acknowledged that the legal definition of "torture" and the medical definition of the term "medical torture" were not necessarily the same and that she was unable to testify about the legal definition of the term "torture."

The Court of Appeals, K. F. KELLY, P.J., and CAVANAGH and RIORDAN, JJ., affirmed defendant's convictions, but it vacated her sentences because of a guidelines scoring error and remanded for resentencing. ___ Mich App ___ (November 20, 2024) (Docket No. 364063). Defendant sought leave to appeal in the Supreme Court, which ordered oral argument on the application, directing the parties to address whether Dr. Nazer invaded the province of the jury by using the phrase "medical torture" to label her diagnosis of MA. ___ Mich ___; 21 NW3d 211 (2025).

In a unanimous opinion by Chief Justice CAVANAGH, in lieu of granting leave to appeal, the Supreme Court *held*:

Dr. Nazer's expert testimony concerning the diagnosis of medical torture was improper because the testimony was unhelpful to the jury, lacked a reliable foundation, and invaded the province of the jury in determining whether defendant was guilty of the crime of torture. However, defendant was not entitled to relief because, in light of the strong evidence properly admitted, she failed to establish that the unpreserved error affected the outcome of the proceedings.

1. Dr. Nazer's testimony was inadmissible under MRE 702 because it was unhelpful to the jury in determining a fact in issue and it lacked a reliable foundation. Expert testimony is only helpful and therefore admissible if it involves a matter that is beyond the common understanding of the average juror, and testimony that lacks a reliable foundation is similarly unhelpful to the jury. An expert's medical opinion might be helpful, in some cases, to explain a particular injury or the mechanism of a particular injury. However, Dr. Nazer's diagnostic testimony did not explain the nature, extent, or timing of MA's physical symptoms in a way that would help the jury determine whether MA suffered great bodily injury, an element of the crime of torture. Further, when an opinion is based solely on what the victim relays to a doctor, in the absence of any evidence qualifying the doctor as an expert in assessing credibility, the opinion lacks a reliable foundation. Dr. Nazer's testimony concerning the psychological maltreatment component of the medical torture diagnosis was based on little more than Dr. Nazer's crediting MA's account of events, and it was therefore unreliable.

2. Dr. Nazer's testimony was also improper because it invaded the province of the jury and ran afoul of the principles laid out in *People v McFarlane*, 325 Mich App 507 (2018), which held that the trial court erred when it allowed a child abuse pediatrician to testify that she had diagnosed the infant victim with "abusive head trauma" and that the injuries amounted to child abuse. An expert witness may not express an opinion on the defendant's intent or criminal responsibility. Whether a defendant is guilty or innocent is tantamount to a legal conclusion, and an expert witness may not testify about the requirements of law that apply to the particular facts in the case or phrase an opinion in terms of a legal conclusion. As in *McFarlane*, the expert testimony diagnosing MA with medical torture came too close to findings that are left exclusively to the jury. The lay meaning of torture—the infliction of intense pain to punish, coerce, or afford sadistic pleasure—maps closely to the intent element of the crime of torture, i.e., that the defendant intended to cause cruel or extreme physical or mental pain and suffering. Dr. Nazer's diagnosis of medical torture likely impressed upon the jury an opinion on defendant's criminal responsibility for the crime for which she was on trial—torture. That the diagnosis was labeled medical rather than legal was immaterial because, regardless of the label given, the diagnostic terminology clearly posed a danger of confusing the doctor's medical diagnosis with the legal determination.

3. Defendant failed to establish that the unpreserved evidentiary error constituted plain error affecting her substantial rights. Although Dr. Nazer's testimony was improper under MRE 702, it was questionable whether admission of the testimony was a clear or obvious error. Moreover, even without Dr. Nazer's problematic testimony, other compelling evidence, untainted by the medical torture diagnosis, remained, including medical testimony about MA's injuries, MA's testimony that he had been zip-tied, and defendant's admissions; therefore, even assuming that the error was plain, defendant did not show that it affected the outcome of the proceedings.

Affirmed.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 15, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 168009

GWENDOLYN JOSEPHINE
ALEXANDER,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, C.J.

In this case, we consider whether it was improper for an expert witness to testify that she diagnosed the child victim with "medical torture" at a trial where defendant was accused of the crime of "torture," MCL 750.85. We hold that admission of this testimony was erroneous, but we nonetheless affirm defendant's convictions because we are unpersuaded that she has established entitlement to relief under the plain-error standard of review.

## I. FACTS

In June 2019, defendant, Gwendolyn Alexander, and her partner and codefendant, Errown Scott, moved into a trailer parked on a vacant lot next door to the home of Scott's mother. Collectively, the two had three young children, MA, RS, and MS.[1] Throughout the summer, the children spent the majority of the time with Scott's mother in her house. In the fall of 2019, however, Scott's mother began experiencing health issues, and therefore, the bulk of the caregiving responsibilities returned to defendant and Scott.

In early January 2020, defendant sent a text to MA's godmother, requesting that she take custody of six-year-old MA. According to the godmother, defendant stated that she was "going to give [MA] away" and that "[s]he was tired of him." A few weeks later, the godmother contacted law enforcement for a welfare check. A responding police officer testified that the trailer was "dirty and gross," with water bottles of urine on the floor alongside rancid food and raw meat. Moreover, the officer observed that MA had bruises on his face, swelling on his neck, and "thick, thick scarring on his wrists." A responding emergency medical technician (EMT) also testified that he saw ligature marks around MA's wrists and ankles and bruising on MA's face.

Based on these discoveries, all three children were transported to a local emergency room. Dr. Shazia Maqbool, the emergency room physician who treated the children, testified that she observed swelling and tenderness around MA's ankles and linear hyperpigmented scars on his ankles and wrists.[2] She diagnosed MA with "suspicious" or

---

[1] Scott is not the biological father of the oldest child, MA, but is the biological father of RS and MS.

[2] Pictures of the injuries were admitted as exhibits at trial.

"nonaccidental" lesions and "[p]ossible child abuse."[3] Dr. Maqbool did not observe any "significant findings" as to three-year-old RS or one-year-old MS.

Thereafter, police interviewed defendant, and, during the interview, defendant admitted that MA had been tied up with a belt around his wrists. Defendant stated that she tied MA up at least twice and that Scott also tied MA up on several occasions. She explained that MA would be tied up for a few hours at a time, ostensibly because defendant was unable to watch him and keep him out of trouble. According to defendant, MA caused his own injuries when he struggled against and tried to "weasel" out of the restraints. Defendant also admitted that MA would often be disciplined with a belt or a ruler and that she took him out of school because of behavioral "difficulties."

Defendant and Scott were arrested and criminally charged with child abuse and torture. The two were tried jointly before separate juries. MA, who was eight years old at the time of the September 2022 trial, testified that Scott "zip tied" his hands. He also testified that Scott zip-tied him around his stomach to the couch. MA denied that defendant tied him up using zip ties but testified that defendant was present when Scott restrained him. MA agreed that he was tied up more than 5 but fewer than 10 times and that it happened inside the trailer. MA explained that he got "a scar" from being zip-tied but that the scars were gone by the time of trial. MA also testified that Scott hit him with a sandal, that he slept on the floor in the trailer, and that he stopped going to school. In addition, six-year-old RS testified that she saw Scott zip-tie MA once and that defendant was home at the time.

---

[3] Defendant does not argue that this testimony was improper.

Dr. Dena Nazer, the medical director of Kids-TALK Children's Advocacy Center, testified at trial as an expert in child abuse pediatrics and general pediatrics. Dr. Nazer explained that she evaluated children referred to her for suspected child abuse. On March 3, 2020, six weeks after the welfare check, she evaluated MA, RS, and MS. Dr. Nazer's typical evaluation included reviewing medical records, information provided by a forensic interviewer, and medical history provided by the child's guardian, as well as a discussion with and a physical examination of the child. Following her evaluation of MA, Dr. Nazer diagnosed him with "medical torture," and she explained:

> [M]edical torture is a clinical diagnosis. It's a medical diagnosis that we give children who have been exposed to at least two different physical assaults, so two physical assaults at two different times.
>
> And it's not just the physical assaults. To qualify for the diagnosis of medical torture, it has to be accompanied by at least two psychological maltreatments or two forms of psychological abuse.[4]

She testified that medical torture was not a common diagnosis and was "reserved for severe cases"[5] and based, in part, "on the criminology of the psychological maltreatment." On cross-examination, Dr. Nazer acknowledged that the legal definition of "torture" and the

---

[4] We note that at oral argument before this Court, the prosecutor clarified that the diagnosis is more commonly referred to as "child torture." See Knox et al, *Child Torture as a Form of Child Abuse* <https://www.tdcaa.com/wp-content/uploads/Knox-Torture-as-a-Form-of-Child-Abuse-article.pdf> (accessed July 13, 2026) [https://perma.cc/JDG5-P4TG]. A "child torture" diagnosis was first used by Knox, the coauthor of this 2014 article. See *State v Hawkey*, 2016-Ohio-1292, ¶ 75; 62 NE3d 721 (Ohio App, 2016) (noting that the expert had created the definition of child torture and that her article had not been published as of 2013).

[5] Although RS's evaluation rendered no physical signs of abuse, Dr. Nazer also diagnosed RS with "medical torture" "based on what [RS] disclosed."

4

medical definition of the term "medical torture" were not necessarily the same and that she was unable to testify about the legal definition of the term "torture."

Eventually, Dr. Nazer testified that the injuries on MA's wrists and ankles were consistent with a history of being zip-tied. When asked why she believed that MA was psychologically abused, Dr. Nazer testified that he was subject to deprivation, isolation, and intimidation. She explained that to reach these conclusions she relied on the forensic interview and "on other information."

Defendant was ultimately convicted of one count of torture, MCL 750.85, one count of second-degree child abuse, MCL 750.136b(3), one count of second-degree child abuse in the presence of another child, MCL 750.136d(1)(b), and one count of third-degree child abuse, MCL 750.136b(5). The jury acquitted defendant of one count of third-degree child abuse concerning RS. Defendant was sentenced to 17 to 30 years' imprisonment for the torture conviction, 6½ to 10 years' imprisonment for the second-degree child abuse conviction, 6½ to 10 years' imprisonment for the second-degree child abuse in the presence of another child conviction, and 96 days in jail for the third-degree child abuse conviction.

Defendant claimed an appeal of right. In a published opinion, the Court of Appeals affirmed defendant's convictions, but it vacated her sentences because of an offense-variable-scoring error and remanded for resentencing.[6] *People v Alexander*, ___ Mich App ___, ___; ___ NW3d ___ (November 20, 2024) (Docket No. 364063); slip op at 1.

---

[6] The prosecutor did not appeal this ruling, so it is not before the Court. Because we now affirm defendant's convictions in this opinion, the trial court may proceed on remand with resentencing as ordered by the Court of Appeals.

5

Relevant here,[7] the Court of Appeals rejected defendant's argument that the trial court committed plain error when it permitted Dr. Nazer to testify regarding "medical torture." *Id*. at 7-8. Defendant thereafter sought leave to appeal in this Court, and we ordered oral argument on the application, directing the parties to address "whether the prosecution's medical expert invaded the province of the jury by using the phrase 'medical torture' to label her diagnosis of the child complainant." *People v Alexander*, ___ Mich ___, ___; 21 NW3d 211, 211 (2025).

## II. STANDARD OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). Where the court's decision involves a preliminary question of law, that question is reviewed de novo. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). However, because defense counsel did not object to Dr. Nazer's use of the term "medical torture," this issue is unpreserved and reviewed only for plain error. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014).

## III. RELEVANT PRINCIPLES OF EXPERT TESTIMONY ADMISSIBILITY

Under MRE 702(a), an expert may testify in the form of an opinion or otherwise if their "scientific, technical, or other specialized knowledge will help the trier of fact to

---

[7] The panel also rejected defendant's arguments that there was insufficient evidence to sustain her torture conviction, that Dr. Nazer's testimony violated MRE 703, and that trial counsel rendered ineffective assistance of counsel. We did not order argument on these issues.

understand the evidence or to determine a fact in issue[.]"[8]  Helpfulness is a "threshold"

inquiry under MRE 702.  *People v Kowalski*, 492 Mich 106, 121; 821 NW2d 14 (2012)

(opinion by MARY BETH KELLY, J.).  Expert testimony is only helpful and thus admissible

if it "involve[s] a matter that is beyond the common understanding of the average juror."

*Id*.  Likewise, testimony that lacks a reliable foundation is also unhelpful to the jury.  *Id*.

Notably, "[a]n opinion is not objectionable just because it embraces an ultimate

issue" to be decided by the trier of fact.  MRE 704; see also *Downie v Kent Prod, Inc*, 420

Mich 197, 205; 362 NW2d 605 (1984) (explaining that when a proper foundation is laid,

opinion evidence "may even embrace ultimate issues of fact") (quotation marks and

citation omitted).  That said, ultimate-issue testimony must otherwise pass muster under

the rules of evidence.  *People v Smith*, 425 Mich 98, 106-107; 387 NW2d 814 (1986).

Moreover, an expert may not give an opinion as to a defendant's guilt or innocence, *People*

*v Robinson*, 417 Mich 231, 234-235; 331 NW2d 226 (1983), or vouch for a witness's

credibility, see *Thorpe*, 504 Mich at 235.  When an expert oversteps these bounds, the

testimony may be properly viewed as invading the province of the jury.  See *People v*

*Young*, 472 Mich 130, 143; 693 NW2d 801 (2005).

---

[8] MRE 702 has been amended twice since the conclusion of defendant's trial.  See MRE 702, as amended September 20, 2023, 512 Mich ___ (2023); MRE 702, as amended March 27, 2024, 513 Mich ___ (2024).  At the time of defendant's trial, MRE 702 provided: "If the court determines that scientific, technical, or other specialized knowledge will *assist* the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion . . . ."  MRE 702, as amended July 22, 2003, 469 Mich cxci (2004) (emphasis added).  We detect no meaningful difference between the word "assist" in the earlier version of the rule and the word "help" in the current version of the rule.

Finally, when it comes to expert testimony, "[o]ften, relevant evidence may be far too prejudicial to present to a jury in its crudest form." *People v Peterson*, 450 Mich 349, 374-375; 537 NW2d 857 (1995). "Since experts base their testimony on science, jurors tend to find the testimony more convincing, and therefore the risk of misleading and confusing them increases." *Kowalski*, 492 Mich at 157-158 (MARKMAN, J., concurring in part and dissenting in part) (quotation marks and citation omitted).

## IV. RELEVANT CASELAW: *PEOPLE v MCFARLANE*

The Court of Appeals resolved this case via comparison to its earlier decision in *People v McFarlane*, 325 Mich App 507; 926 NW2d 339 (2018). See *Alexander*, ___ Mich App at ___; slip op at 6-8. Therefore, a summary of that decision, in addition to the above-described principles, is appropriate before turning to our analysis.

In *McFarlane*, 325 Mich App at 512, 515, the defendant was charged with first-degree child abuse, MCL 750.136b(2), after his infant daughter suffered serious injuries, including subdural bleeding, retinal hemorrhages, and subdural hematoma. The prosecution presented expert testimony from a child abuse pediatrician, who diagnosed the child with "definite pediatric physical abuse." *Id*. at 517 (quotation marks omitted). The defendant argued that the trial court erred when it admitted the testimony because it amounted to an opinion that he was guilty of the charged crime. *Id*.

The Court of Appeals agreed. See *id*. at 523-525. The panel explained that "a physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease . . . ." *Id*. at 522. According to the panel, opining that an injury was

8

inflicted rather than accidental does not "invade the province of the jury" in determining guilt and innocence, because the jury is free to reject the expert's opinion. *Id*. at 523. However, in a case that involves allegations of abuse, an expert "goes too far" when she makes a diagnosis like "abusive head trauma." *Id*. (quotation marks omitted). This is because the ordinary understanding of abuse "implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge . . . ." *Id*. This runs afoul of the principle that "[a]n expert may not offer an opinion on the intent or criminal responsibility of the accused." *Id*. Applied to the facts of that case, the Court of Appeals concluded that the trial court committed error when it allowed the expert "to use the phrase 'abusive head trauma' to label her diagnosis rather than a less prejudicial label" and when it allowed her to agree that the child's "injuries amounted to 'child abuse.' " *Id*. at 524-525.

## V. COURT OF APPEALS

In this case, defendant was charged with "torture" in violation of MCL 750.85. A person is guilty of torture if they (1) act with "the intent to cause cruel or extreme physical or mental pain and suffering" and (2) "inflict[] great bodily injury or severe mental pain or suffering upon another person within [their] custody or physical control . . . ." MCL 750.85(1). Defendant argues on appeal that it was plain error for the trial court to admit expert testimony diagnosing MA with medical torture.

The Court of Appeals concluded that the testimony at issue was not improper like the testimony in *McFarlane* because Dr. Nazer's use of the term medical torture "did not have the potential to conflate [her] medical diagnosis with a legal conclusion concerning defendant's legal responsibility." *Alexander*, ___ Mich App at ___; slip op at 7. The panel

9

reasoned that "[d]uring her trial testimony, Dr. Nazer . . . shared that she made a medical, not legal, diagnosis of 'medical torture' after having the opportunity to review the minor child's medical records, conduct a physical examination, and interview MA." *Id*. In addition, the panel concluded that Dr. Nazer's diagnosis of medical torture "did not suggest that defendant acted knowingly or intentionally," nor did her testimony "address any element of the crime charged." *Id*. at ___; slip op at 8. The medical torture diagnosis was tied to Dr. Nazer's finding of at least two instances of physical harm and two instances of psychological harm, but that did not "suggest any amount of intentionality." *Id*. The panel also noted that the prosecution "did not advance that the jury should rely on Dr. Nazer's testimony in its determination of whether defendant possessed the requisite intent to establish torture." *Id*. The Court of Appeals concluded finally that, even if the admission of the testimony was improper, the error did not entitle defendant to relief. *Id*. at ___; slip op at 8-9.

## VI. ANALYSIS

We conclude that Dr. Nazer's expert testimony concerning the diagnosis of medical torture was improper in this case. The diagnostic testimony did not help the jury understand a fact in issue, lacked a reliable foundation, and invaded the province of the jury.

## A. HELPFULNESS

One threshold issue in the realm of expert testimony is whether the testimony will help the jury determine a fact in issue. MRE 702; *Kowalski*, 492 Mich at 121 (opinion by MARY BETH KELLY, J.). An expert's medical opinion might be helpful, in some cases, to explain a particular injury or the mechanism of a particular injury. For example, in

10

*McFarlane*, expert testimony was needed because "it was beyond the ken of ordinary persons to evaluate the medical evidence and assess the nature and extent of [the complainant]'s injuries, the timing of those injuries, and the possible mechanisms of injury implicated by the medical evidence." *McFarlane*, 325 Mich App at 518. Similarly, in this case, expert medical testimony could help the jury assess the nature, extent, and timing of MA's injuries relevant to the issue of whether he suffered "great bodily injury," which is an element of the crime of torture. MCL 750.85(1).

We do not believe, however, that Dr. Nazer's medical torture diagnosis testimony helped the jury assess MA's injuries. Dr. Nazer simply explained that the medical torture diagnosis was appropriate where a child is exposed to "two different physical assaults" and "two psychological maltreatments." As for the former, Dr. Nazer's diagnostic testimony did not explain the nature, extent, or timing of MA's physical symptoms in a way that would help the jury determine whether MA suffered great bodily injury. Compare, for example, Dr. Maqbool's helpful testimony in this case, in which she described the linear scars she observed on MA, the scars' hyperpigmented appearance, and how she discerned that the wounds were not fresh, or Dr. Nazer's later helpful testimony that the linear scarring was "consistent" with being zip-tied. This comparison shows the difference between testimony that helps the finder of fact assess an element of the charged crime of torture, i.e., whether great bodily injury was inflicted, and testimony like the medical torture diagnosis, which does not. Dr. Nazer's testimony diagnosing MA with medical torture was unhelpful and thus inadmissible under MRE 702.

11

## B. RELIABLE FOUNDATION

As to the psychological maltreatment component of the medical torture diagnosis, Dr. Nazer's testimony supporting her opinion that MA was subject to psychological maltreatment was also unhelpful to the jury but for a different reason—it lacked a reliable foundation. See *Kowalski*, 492 Mich at 121 (opinion by MARY BETH KELLY, J.). Where an opinion is "based solely on what the victim" relays to a doctor, "[i]n the absence of any evidence qualifying [the doctor] as an expert in assessing credibility, [the] opinion lack[s] a reliable foundation." *Smith*, 425 Mich at 109. "[A]n examining physician cannot give an opinion on whether a complainant had been . . . assaulted if the 'conclusion [is] nothing more than the doctor's opinion that the victim had told the truth.'" *Thorpe*, 504 Mich at 262 (citation omitted; second alteration in *Thorpe*). Our review of the record demonstrates that the psychological maltreatment component of the medical torture diagnosis was based on little more than Dr. Nazer's crediting MA's account of events, which was disclosed to Dr. Nazer and to others.[9]

We therefore conclude that Dr. Nazer's testimony diagnosing MA with medical torture was also unreliable and thus inadmissible under MRE 702.

## C. INVADING THE PROVINCE OF THE JURY

We further disagree with the Court of Appeals' conclusion that the medical torture testimony did not run afoul of the principles laid out in *McFarlane*, 325 Mich App 507. Like *McFarlane*, this case involves the admissibility of accepted medical terminology that

---

[9] Dr. Nazer explained: "[W]e are not physically there in the children's home in order to—to witness that [i.e., psychological maltreatment]. That's why in the Child Advocacy Center . . . we rely [on] forensic interviewers, we're relying on other information . . . ."

12

may be misconstrued by laypersons as imparting emotionally charged or legally conclusory connotations. The Court of Appeals concluded that Dr. Nazer's diagnostic testimony using the term medical torture lacked the "potential to conflate Dr. Nazer's medical diagnosis with a legal conclusion concerning defendant's legal responsibility," and that the testimony "did not suggest that defendant acted knowingly or intentionally." *Alexander*, ___ Mich App at ___; slip op at 8. In our opinion, however, the same concerns that arise when a child abuse pediatrician diagnoses a child with "abusive head trauma" in an abuse case, *McFarlane*, 325 Mich App at 523 (quotation marks omitted), are present when a child abuse pediatrician opines that she has diagnosed the child with "medical torture" in a torture case.

An expert witness "cannot express an opinion on the defendant's guilt or innocence of the charged offense." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013); see also *People v Drossart*, 99 Mich App 66, 79-80; 297 NW2d 863 (1980); *People v Parks*, 57 Mich App 738, 750; 226 NW2d 710 (1975). Whether a defendant is guilty or innocent is tantamount to a legal conclusion. And it is "important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion." *Drossart*, 99 Mich App at 75. So, although MRE 704 would generally not prohibit testimony about an ultimate issue (here, intent),[10] such testimony would not be "otherwise admissible" pursuant to this long-standing maxim.

---

[10] Unlike the federal rule of evidence, FRE 704(b), which prohibits an expert witness in a criminal case from stating an opinion about a defendant's mental state, MRE 704 does not contain such an exception. That said, such testimony must still be "otherwise admissible" and comply with all of the other rules of evidence, meaning, for example, that it must be

13

Like the Court of Appeals in *McFarlane*, we conclude that the expert testimony diagnosing MA with medical torture "comes too close to findings that are left exclusively to the jury." *McFarlane*, 325 Mich App at 521 (quotation marks and citation omitted). The lay meaning of "torture" would be generally understood as "the infliction of intense pain . . . to punish, coerce, or afford sadistic pleasure." *Merriam-Webster's Collegiate Dictionary* (11th ed). This definition maps closely to the intent element of the crime of torture: the defendant intended "to cause cruel or extreme physical or mental pain and suffering." MCL 750.85(1). That Dr. Nazer diagnosed MA with medical torture, therefore, likely impressed upon the jury an opinion on defendant's criminal responsibility for the crime for which she was on trial—torture. And, unlike a medical opinion encompassing whether an injury was caused non-accidentally or by human agency, the term "torture," like the term "abuse," "implies a level of willfulness and moral culpability." *McFarlane*, 325 Mich App at 523.

Unlike the panel below, we are not swayed by the fact that Dr. Nazer's diagnostic testimony was a "medical" diagnosis and not a legal one. The same was, of course, true in *McFarlane*, 325 Mich App at 517 (quotation marks omitted), where the diagnosis of "definite pediatric physical abuse" was also a medical diagnosis. More importantly,

---

relevant, reliable, based on an adequate foundation, and helpful to the trier of fact, and it must present sufficient probative force to overcome any unfair prejudice. See, e.g., *People v Sharpe*, 502 Mich 313, 331; 918 NW2d 504 (2018) (analyzing whether evidence that was not excluded by the rape-shield statute was "otherwise admissible" under other rules of evidence, such as MRE 401, MRE 402, and MRE 403). Strict compliance with these concepts of admissibility becomes particularly important in the realm of expert testimony. See *Thorpe*, 504 Mich at 230 ("[A]n expert will often represent the only seemingly objective source, offering [the jury] a much sought-after hook on which to hang its hat.") (quotation marks and citation omitted).

regardless of the label given, the diagnostic terminology clearly posed a danger of confusing the doctor's medical diagnosis with the legal determination. See *People v McFarlane*, 505 Mich 1059, 1062 (2020) (CAVANAGH, J., concurring) ("The terminology at issue here has the potential to confuse medical diagnosis with legal determination . . . ."). As discussed, this testimony was unhelpful, lacked a reliable foundation, and invaded the province of the jury in its duty to determine defendant's guilt. In other words, the testimony had marginal probative value and the substantial risk of prejudice. See *People v Beckley*, 434 Mich 691, 724; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.) ("As reliability diminishes, the prejudicial effect of the evidence increases."). The danger that the jury will be misled when looking to an expert's opinion for "a much sought-after hook on which to hang its hat" cannot be overstated. *Peterson*, 450 Mich at 374 (quotation marks, citation, and emphasis omitted). In sum, the risk that the jury might improperly confuse a medical torture diagnosis with an expert opinion that defendant was guilty of torture by deferring to the expert's unhelpful and unreliable opinion renders the medical torture diagnosis testimony improper.

## VII. PLAIN ERROR

Although we conclude that the medical torture diagnosis testimony was improper in this case, because the issue is unpreserved, we must consider whether defendant is entitled to relief under the plain-error standard of review. To be granted relief under the plain-error standard, a defendant must show that (1) an error occurred; (2) the error was clear or obvious; and (3) the error affected substantial rights, which generally means that it affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130

15

(1999). Once the defendant has made such a showing, reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

First, as discussed, we conclude that defendant has established that the medical torture testimony was improper. We question, however, whether admission of the testimony was a "clear or obvious" error. *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted). Although, for example, *McFarlane* also considered the issue of problematic medical diagnostic testimony, *McFarlane* dealt with different terminology, diagnoses, and criminal charges and thus was not necessarily binding on the issue in this case. See *Randolph*, 502 Mich at 10 (providing that an error is not "clear or obvious" if it is "subject to reasonable dispute") (quotation marks and citation omitted). However, even assuming that the error was plain, we conclude that defendant's claim fails on the question of whether the error affected her substantial rights. That is, in light of the strength of the remaining evidence, we cannot conclude that the error affected the outcome of the lower court proceedings. *Id.*

Even without Dr. Nazer's problematic testimony concerning medical torture, other compelling evidence remained in this case. Dr. Nazer, for example, appropriately testified that six weeks after MA was removed from defendant's care, circumferential scarring remained around both his wrists and ankles. She confirmed that the scarring was consistent with ligature marks and with being tied with zip ties. This testimony concerning MA's injuries was not tainted by the problematic medical torture diagnosis. Another expert, the emergency room physician, Dr. Maqbool, also offered untainted medical testimony about the ligature marks, as did a responding police officer and an EMT.

16

Additional evidence further cuts against the finding of prejudice. Both MA and RS testified that MA had been zip-tied. Most significantly, defendant herself admitted to police that she had tied MA's wrists on more than one occasion and had instructed Scott to tie up MA. The jurors watched defendant's interview and heard her admit to tying up MA instead of keeping watch over him, and they heard her blame the ligature marks and scars on MA's attempt to escape the restraints. Other evidence of defendant's attitude toward and treatment of MA shed additional light on defendant's intent and her treatment of the child, including that defendant told MA's godmother she "was tired of him" and wanted to "give him away," that MA was made to sleep on the floor in the trailer, and that he was not regularly fed. Taken together, the evidence strongly supported that defendant intended to cause MA cruel or extreme physical or mental pain and suffering and that she inflicted great bodily injury. MCL 750.85(1).

It is also relevant that Dr. Nazer admitted during cross-examination that she could only testify about medical definitions, not legal definitions. The prosecutor emphasized this admission during closing argument when she stated, "[Y]ou heard from Dr. Nazer, who . . . diagnosed [MA] and [RS] as having medical torture, which is . . . different than legal torture."[11] And the jury was provided an instruction indicating that it was free to

---

[11] The Court of Appeals cited this closing argument as a reason why the testimony was not erroneous. See *Alexander*, ___ Mich App at ___; slip op at 8 ("[W]hile the prosecution noted in its closing argument that Dr. Nazer had characterized the symptoms as having been caused by abuse, the prosecution did not advance that the jury should rely on Dr. Nazer's testimony in its determination of whether defendant possessed the requisite intent to establish torture."). We disagree that the prosecutor's subsequent use (or nonuse) of improper testimony would impact whether the testimony was erroneously introduced in the first place. However, this is certainly relevant to whether defendant can demonstrate prejudice.

accept or reject witness testimony. See *People v Davis*, 509 Mich 52, 78; 983 NW2d 325 (2022) (noting that jurors are presumed to follow their instructions). In light of the strong evidence properly admitted, we conclude that defendant has not established that the asserted error affected the outcome of the proceedings.

## VIII. CONCLUSION

Although we hold that the expert testimony concerning medical torture in this case was unhelpful to the jury, lacked a reliable foundation, and invaded the province of the jury, we nonetheless are unpersuaded that the testimony affected the outcome of the trial. We, therefore, affirm the judgment of the Court of Appeals.

Megan K. Cavanagh
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

18